Filed 7/31/25  P. v. Knowles CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH MEKHI KNOWLES,<br><br>        Defendant and Appellant. | B336296<br><br>(Los Angeles County<br>Super. Ct. No. TA154553) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa P. Magno, Judge.  Affirmed.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joseph Knowles of first degree murder and found that he personally used a gun. At his trial, the prosecution introduced gang evidence, even though Knowles was not charged with a gang allegation. On appeal, Knowles contends there is insufficient evidence he shot and killed the victim and premeditated. He further contends that the trial court abused its discretion by admitting gang evidence, erred in denying a mistrial motion, and erred in failing to instruct the jury on voluntary manslaughter and on the provocation that reduces a first degree murder to second degree murder. We reject all of Knowles's contentions and affirm the judgment.

## BACKGROUND

I.     Evidence at trial

Knowles was charged with the murder of Edward Jenkins. The prosecutor's theory of the case was Knowles shot and killed the victim during a gang confrontation. However, the People did not allege a gang enhancement against Knowles.

A.     *The shooting at the strip mall*

On June 9, 2020, at around 9:30 p.m., the victim Edward Jenkins was with his sibling Deshun Jenkins,[1] Raquel Keaton, and Sandra Garcia[2] outside of Imperial Liquor Land, which was in a strip mall at South Vermont Avenue and Imperial Highway. Vincent Jones, the store's security guard, was also there that night.

---

[1]     We refer to the Jenkins siblings by their first names to avoid confusion.

[2]     Garcia and Edward have a child together.

2

Deshun abused drugs and was living in a tent nearby. Edward had come to see Deshun that night. According to Deshun, they associated with Pimptown, which Deshun said was not a gang but was about "the ladies" and doing "licks and shit like that."

Edward and the others were hanging out in the strip mall's parking lot when a group of people crossed Vermont. Keaton estimated there were 10 to 15 people in the group. In a statement to police given soon after the incident, Deshun said that the group yelled, "Denver Lanes." But at trial, Deshun said the group was "gangbangin' on cars" and yelling " 'Blood' " and " 'Bounty Hunters.' " Deshun explained that the people could have been from Denver Lane but were yelling the name of a different gang, Bounty Hunters. Garcia heard someone from a car yell back, " 'Oh, fuck you, Blood. On Denver Lane, get your ass beat.' "

Members of the group went into the liquor store. When they came out, they asked everyone where they were from. Some of the group approached Deshun and Edward. The group accused Deshun and Edward of gangbanging, being from Pimptown, and being the " 'Crip niggas we lookin' for.' " Edward responded, " 'Yeah, y'all know what it is. Y'all know who I am' " and that he was Pimptown. Deshun assumed that Edward had a prior beef with the group because they seemed to target Edward.

Two men came from the strip mall parking lot area about a minute after the main group and joined that main group in confronting Edward. Jones testified that one of the men who came from the parking lot area wore a black hoodie and had a gun. Keaton said that these two men asked her where she was from.

A fight quickly broke out.  Keaton and Deshun said that they and their friends did not throw the first punch.  Instead, Deshun told detectives that the man who threw the first punch wore a grayish-black sweatshirt with no hood, was over six feet tall, and had short dreads.  Deshun also testified that a man wearing a black hoodie and dark blue or black pants tried to pull out something chrome-colored that could have been a gun, but somebody stopped him or he changed his mind.  Edward ran between parked cars, near a walkway fronting the stores in the strip mall.

Deshun heard multiple gunshots and a second gun being fired.  Deshun could tell it was a different gun because it was "shooting faster" and "more heavy artillery."

Garcia was with Edward.  She told the shooter, who wore a black hoodie, to stop because " 'He's handicapped.' "[3]  But the shooter said, " 'I don't give a fuck.' "

Edward died from a gunshot wound to the head.  He also had a graze wound on his calf.

B.    *Identifications*

The security guard, Jones, told police after the shooting that the shooter wore a black hoodie, but Jones could not identify the shooter.  Keaton also did not see Edward get shot or the shooter.

On June 12, 2020, which was several days after the shooting, Deshun and Garcia separately identified Knowles from photographic six-packs.  Deshun identified Knowles as the man with a gun; however, Deshun did not see the actual shooting and

---

[3]    Edward could not see out of one eye.

4

therefore could not say Knowles was the shooter. Garcia agreed that the shooter wore a hoodie. She identified Knowles as the shooter from a photographic six-pack, but she was only 50 percent certain of her identification. At trial, Garcia identified Knowles as the shooter.

### C. *Ballistics and cellphone evidence*

Law enforcement recovered fired bullets and 15 cartridge cases from the crime scene. All of the cartridge cases were fired from the same gun. Thus, this ballistics evidence suggested that only one gun was used during the events.

On the night Edward was killed, Knowles's cellphone was in Los Angeles before the shooting, and at 9:45 p.m., the cellphone used a cell tower near Vermont where the shooting occurred. After the shooting, the cellphone travelled to San Diego.

### D. *Video surveillance*

The trial court admitted video surveillance from three locations: the liquor store, the donut store in the same strip mall, and the gas station across the street from the strip mall. The videos were in color, had no sound, and were played for the jury while the investigating officer, Detective Scott Lawler, narrated. The entire incident, from when the main group crossed Vermont and arrived at the strip mall to when they fled the strip mall, occurred in about 3 minutes. Based on the detective's review of the videos, he believed that a man in red shoes was the shooter.

First, the liquor store video showed a group of people crossing Vermont at about 9:40 p.m. Some of them approached Edward. Two men then immediately approached Edward from behind. One man wore a gray hooded sweatshirt. The second

5

man wore red shoes, a black hooded sweatshirt, and dark pants with a red stripe down them. A physical fight quickly ensued between the Jenkins siblings and the others, including the two men who had approached Edward from behind. Edward ran away to between two parked cars. The man in a black hooded sweatshirt and red shoes ran with an outstretched arm, and multiple muzzle flashes could be seen as he ran.

The donut shop surveillance showed Edward between two cars and bullet impacts creating sparks. Detective Lawler did not see Edward's group do anything aggressive toward the other group.

Finally, the gas station surveillance showed the group walking across Vermont, as cars stopped for them. The detective said that the person he believed was the shooter was not with that initial group. Instead, the individual in a black sweatshirt, red shoes, and red-striped, camouflage pants, whom the detective believed to be the shooter, and the individual in a gray sweatshirt appeared a bit later "from the right-hand side."

E.    *Social media evidence*

The day after the shooting, Detective Lawler shared the video or video stills from the surveillance footage with Sergeant Carlos Gonzalez, an expert on gangs in the area where the murder occurred. Using that information, Sergeant Gonzalez searched social media and found a photograph of individuals in an alley who were wearing the same clothing as members of the group that crossed Vermont the night Edward was killed. Knowles was one of the group, and in the photograph he wore red-striped, green camouflage pants and red shoes.

6

In another photograph found on social media, Knowles is wearing the same red-striped, green camouflage pants, and he is with a man wearing a gray hooded sweatshirt.

On the afternoon of June 10, 2020 (the day after the shooting), Sergeant Gonzalez found a group photo on social media that had been posted as part of a story on Instagram on June 10, 2020. An Instagram story disappears 24 hours after it is posted. In the photo, Knowles is with people the sergeant knew to be Denver Lane gang members based on the sergeant's prior contacts with them. The photo was taken at Gil's Liquor, which is a Denver Lane hangout.

Detective Lawler met with Detective Alex Torres in April 2021 because Detective Torres had personal contact with Knowles and was familiar with him through social media. Detective Torres subpoenaed records from Knowles's social media account. In one photograph posted on social media of Knowles he is wearing red shoes. In another photograph, Knowles is with Pasadena Denver Lane gang members. Detective Torres recognized Knowles in the video surveillance as the person wearing a black hooded sweatshirt, camouflage pants with a red vertical stripe down the leg, and red shoes. He also recognized five other individuals.

A criminalist, Luza Luna, also searched Knowles's social media accounts and found a photograph posted on June 6, 2020 (three days before the shooting) in which Knowles is wearing red shoes.

F.      *Gang expert testimony*

Sergeant Gonzalez testified for the People as a gang expert. He was assigned to the Denver Lane Bloods gang, whose territory is the 105 Freeway to the north, Imperial Highway to the south,

7

the 110 Freeway to the east, and Vermont to the west. Vermont is a "threshold location" in which the Denver Lane gang claims the eastbound curb but not the westbound curb. Denver Lane also has a subset in Pasadena, so its slogan is " 'Two Cities, one Lane. The Denver Lane Bloods.' "

Blood gangs often drop letters from the alphabet that are associated with rivals; for example, Bloods will say "bity" instead of city, because Crips starts with the letter "c."

Photographs of Knowles at Denver Lane gang strongholds were introduced. One photograph was taken at Gil's Liquor at 109th and Figueroa, where Denver Lane gang members hang out. They also hang out at a nearby motel on Figueroa, near the 110 Freeway. In the photographs, individuals are making hand signs associated with Denver Lane. In photographs, Knowles is wearing red shoes, which appear to be red, low-top Nike Air Force 1.

Sergeant Gonzalez had no prior contacts with Knowles but believed he was a Pasadena Denver Lane gang member based on Knowles's tattoos, his presence at gang strongholds, and his association with other Denver Lane gang members. Knowles has "D" and "L" tattooed on his right forearm and "Denvaju3k" with the "k" crossed out on his face. Denvaju3k refers to Denver Lane. Denva is short for Denver Lanes, and 3k is a derogatory term for Crip killer.

The Bounty Hunters is a large Watts gang, and it is a completely separate gang from Denver Lane Bloods.

When given a hypothetical in which a group of Denver Lane gang members cross a street into rival territory, Sergeant Gonzalez opined that they would do so to promote criminal

misconduct, cause havoc, and commit violence on rivals. Committing violence elevates a member's status.

Sergeant Gonzalez also explained that "gangbanging" refers to active members who are trying to promote their gang and themselves through violence or selling drugs. " 'Where are you from' " is "one of the most violent things you can hear in the city of Los Angeles," because it's asking what gang you are from. Also, "snitching" is breaking the code of silence that gang members and community members are expected to uphold. Snitching can result in acts of violence, including getting shot or killed. So it is possible for a witness to identify one gang as the perpetrator of a crime but then later testify that it was different gang to avoid being known as a snitch.

II.     Information, verdict, and sentence

A jury convicted Knowles of first degree murder (Pen. Code,[4] § 187, subd. (a)), found true an allegation that he committed the murder willfully, deliberately, and with premeditation (§ 189, subd. (a)), and found true a personal gun use allegation (§ 12022.5, subd. (a)).

At the December 18, 2023 sentencing hearing, the trial court, at a bench trial, found that Knowles had a prior conviction within the meaning of the Three Strikes law and sentenced him to 25 years to life, doubled to 50 years to life, plus four years under section 12022.5, subdivision (a).

---

[4]     All further undesignated statutory references are to the Penal Code.

## DISCUSSION

I.    Sufficiency of the evidence

Knowles contends that the evidence was insufficient to support, first, the jury's premeditation finding, and second, that he was the actual killer. After setting forth the standard of review, we address, and reject, each contention.

A.    *Sufficiency of the evidence standard of review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) Our "task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 278; accord, *People v. Rodriguez* (1999) 20 Cal.4th 1, 12 [reversing court of appeal that reweighed evidence].)

The same standard of review applies to cases where the prosecution relies primarily on circumstantial evidence. (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 57 [substantial evidence includes circumstantial evidence and reasonable inferences drawn from it].) " 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' " (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

B.    *Sufficient evidence supports the premeditation finding*

The jury found that Knowles committed premeditated murder. As we now explain, Knowles's argument that the evidence was insufficient to support that finding is based on an improper reweighing of the evidence.

Murder is of the first degree when it is willful, deliberate, and premeditated. (§ 189, subd. (a).) A killing is premeditated and deliberate if it is considered beforehand and occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*Ibid.*) However, it is unnecessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act. (§ 189, subd. (d).) Premeditation and deliberation do not require any extended period of time. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.) The issue is not so much the duration of time as it is the

extent of reflection, because thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly.  (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

Three categories of evidence are especially probative to establish premeditation and deliberation:  (1) planning activity, i.e., what was the defendant doing before committing the crime, (2) motive, i.e., facts about the relationship between the victim and the defendant, and (3) the manner of killing.  (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27.)  These *Anderson* factors are not all required, are not exclusive, and need not be accorded any particular weight; instead, they are a framework to guide appellate review.  (*People v. Morales* (2020) 10 Cal.5th 76, 89.)  Substantial evidence of premeditation will typically be found where there is evidence of all three *Anderson* factors or extremely strong evidence of planning, or of motive in conjunction with planning and manner of killing.  (*People v. Williams* (2018) 23 Cal.App.5th 396, 409.)

Here, there was evidence of all three *Anderson* factors.  First, there was evidence that the group planned to engage in a gang confrontation.  A photograph was taken of Knowles with other Denver Lane gang members at Gil's Liquor, a known gang hangout.  Sergeant Gonzalez came across that photograph on June 10, 2020 in an Instagram story, which is available for 24 hours after it is posted.  Inferentially, the group gathered at Gil's Liquor before walking to Liquor Land.  As they did so, they loudly and disruptively crossed Vermont while yelling gang-related names.

At the strip mall, the group then asked Edward and his friends where they were from, which, as the gang expert testified, is a dangerous and provocative question.  (See, e.g., *People v.*

*Ward* (2005) 36 Cal.4th 186, 210 [expert gang testimony admissible to explain "defendant's motivation for entering rival gang territory and his likely reaction to language or actions he perceived as gang challenges"].)  There was also evidence that Knowles was armed with a gun, which evidenced preparing and planning for a violent confrontation.  (See, e.g., *People v. Cardenas* (2020) 53 Cal.App.5th 102, 122 & cases cited therein.)  Therefore, that about 10 individuals travelled as a group into rival gang territory while loudly issuing gang challenges to passing cars and, ultimately, to Edward and his friends, and that Knowles was armed shows that Knowles planned a violent confrontation.

Second, this same evidence shows that there was a gang-related motive for the murder.  The Denver Lane group crossed Vermont, which is a "threshold location," with Denver Lane claiming the eastbound but not westbound curb.  Therefore, the Denver Lane group crossed into rival territory.  Moreover, the group accused Edward of being from Pimptown and of being the " 'Crip niggas *we lookin' for*.' "  (Italics added.)  That the group seemed to know Edward was from Pimptown and said they were "lookin' for" them supported Deshun's supposition that they were seeking and targeting Edward.  The gang expert also gave this gang confrontation additional context, explaining that gangs engage in violence against rivals to elevate their status.  (See, e.g., *People v. Huynh* (2021) 65 Cal.App.5th 969, 980–981 [common gang motives include criminal activity against rival or suspected rival; a battle over gang territory; intimidation preceded by gang signs and identification; or bolstering one's reputation within gang].)

Finally, the manner of killing supports the premeditation finding. Knowles and a second man approached Edward from behind, while their associates were confronting Edward. Edward was therefore surrounded by his aggressors. Deshun saw Knowles begin to pull a gun from his pants but put it back. Although Knowles did not use the gun at that moment, that he reached for it nonetheless speaks strongly to premeditation because it shows his willingness to use the gun, as the evidence shows he did very shortly thereafter. Keaton said Edward backed up with his palms out, showing he was unarmed. However, Edward was shot in the head, which is a type of shooting that suggests premeditation. (See, e.g., *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 271 [close range shooting without provocation supports premeditation finding]; see *People v. Bloyd* (1987) 43 Cal.3d 333, 348 [shooting victim in head "execution-style" at point-blank range without evidence of struggle supported first degree murder conviction].)

In response, Knowles makes much of evidence that he was not with the first group of people who crossed Vermont and asked everyone where they were from. Instead, he and his companion in the gray sweatshirt arrived at the strip mall a minute later, when the main group was already confronting Edward. Knowles therefore argues that he was not really involved in the gang challenges, implying he just happened upon the fight and believed that his friends, not Edward, were in danger. However, the evidence we cited above supports a different interpretation: Knowles went to the strip mall looking for rival gang members, intending to commit violence. We may not reweigh the evidence. (*People v. Covarrubias, supra*, 1 Cal.5th at p. 890.) Moreover, the evidence strongly supported the inference that Knowles was part

14

of the Denver Lane group, even if he got to the strip mall a minute after the main group did.  As soon as Knowles arrived at the strip mall, he asked Keaton where she was from and joined his fellow gang members in surrounding and confronting Edward and Deshun.

Knowles also suggests that this shooting was unplanned, and the shooter merely fired "wildly" in the parking lot.  However, the evidence we summarized above supports the finding that Knowles intentionally shot Edward.  That the shooting took place very quickly after Knowles arrived at the strip mall does not negate premeditation.  Rather, premeditation can occur quickly.  (*People v. Potts*, *supra*, 6 Cal.5th at p. 1027.)  Moreover, Deshun saw Knowles start to take out a gun before putting it back, which shows Knowles's intent to use the gun.  And that Knowles continued shooting as he ran away does not undermine the premeditated nature of the murder, as Knowles argues, but supports it.  Wildly firing his gun after shooting Edward in the head shows an intent to continue harming anyone in the vicinity.

Finally, in his reply brief, Knowles argues that gang evidence could be considered on issues of motive and identification but not to show he premeditated.  That is, CALCRIM No. 1403 instructed the jury it could consider gang evidence for the limited purposes of whether Knowles had a motive for the charged crime, to evaluate the credibility of a witness, and when it considered "the facts and information relied on by an expert witness in reaching" an opinion.  Knowles thus suggests that CALCRIM No. 1403 prohibited the jury from considering gang evidence to prove premeditation.

15

However, Knowles did not expressly raise this issue in his opening brief, and therefore it is forfeited. (See generally *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158 [" 'Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue.' "].)

In any event, motive is often probative of intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 741.) Here, Knowles's intent was in many ways inextricably linked to his motive, and therefore it was proper for the jury to consider the gang evidence as relevant to his intent and whether he premeditated. Although CALCRIM No. 1403 did not expressly state the jury could consider the gang evidence to determine whether Knowles premeditated, that was a proper purpose of the gang evidence.

We therefore conclude that sufficient evidence supports the premeditation finding.

C. *Sufficient evidence supports the murder conviction*

The prosecutor's theory of the case was that Knowles was Edward's actual killer, so the jury was not instructed on any aiding and abetting theory of murder liability. Knowles, however, contends that the evidence was insufficient to show that he shot and killed Edward. We disagree.

Witnesses consistently testified that the person who shot Edward wore a black hoodie. Jones told the police that the shooter wore a black hoodie. Garcia testified that the shooter wore a black hoodie, and she identified Knowles as the shooter twice, once from a photographic six-pack soon after the murder and a second time at trial. The only person Deshun saw with a

16

gun wore a black hoodie, although Deshun did not see the actual shooting. Forensic evidence suggested that there was only one shooter: 15 cartridge cases were found at the crime scene, all of those cartridge cases were fired from the same gun, and casings were found in locations consistent with where the muzzle flashes were seen on the video surveillance.

That video surveillance shows a person in a black hooded sweatshirt and red shoes with his arm outstretched and muzzle flashes. This is the only person in the video who appears to shoot a gun. Detective Torres recognized Knowles in the video surveillance as the person wearing a black hooded sweatshirt, camouflage pants with a red vertical stripe down the leg, and red shoes.

Knowles does not discuss this evidence supporting the conviction and instead cites Deshun's testimony that there were two shooters because Deshun heard two guns. But, as we have said, other eyewitness testimony, video surveillance, and ballistics evidence showed that there was only one shooter, Knowles. We may not reweigh the evidence on appeal. Rather, there being more than sufficient evidence that Knowles shot and killed Edward, Knowles's argument amounts to nothing more than an improper request that we reweigh evidence, reevaluate a witness's credibility, and resolve credibility issues or evidentiary conflicts. (See generally *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 890; *People v. Gomez* (2018) 6 Cal.5th 243, 278.)

II.    Admission of evidence regarding gang culture and snitching

Knowles contends that the trial court abused its discretion by allowing the prosecution to introduce evidence about gang

17

culture and snitching in the absence of a gang allegation.  We disagree.

### A.    *Additional background*

At the preliminary hearing, Deshun testified about the events at the Liquor Land strip mall.  When asked if there was a reason Deshun did not want to testify, Deshun answered it was "a safety reason," and Deshun had "been hearing people still looking around [ ] looking for us and things like that."  Deshun clarified that people from that night were looking for witnesses to the crime, and Deshun did not want to get caught in any "crossfire because of what happened."  Deshun had heard of the term, "snitch," and understood that identifying someone could result in being killed.

Then, before trial, defense counsel objected on relevance grounds to any testimony that a witness was afraid.  The trial court responded that if it became apparent a witness was recanting or not making an identification, it could be relevant, so if the issue arose during trial, counsel should approach the bench.

During Deshun's trial testimony about identification, the prosecutor asked at sidebar if he could inquire whether Deshun had any concerns about gangs that might affect Deshun's testimony.  The trial court noted the defense's objection.  Back before the jury, the prosecutor asked Deshun about growing up in an area with gangs and whether Deshun knew what it meant to be a snitch in the context of gang culture.  Deshun denied having anything to snitch about.

Back at sidebar, defense counsel objected to any further questions about snitching because Deshun forcefully denied being fearful.  The prosecutor responded that the questions were relevant, especially since Deshun's trial and preliminary hearing

18

testimony were inconsistent.  The trial court then observed that Deshun was at times evasive, nonresponsive, defensive, and had accused detectives of lying.  Some of Deshun's answers were, as the trial court described, "bizarre" and could be caused by being under the influence of a substance or be an attempt not to snitch.  Therefore, the trial court said it would allow the prosecution to pursue the line of questioning and to impeach Deshun with Deshun's preliminary hearing testimony.  In determining how far the prosecutor could go, the trial court said it would be guided by Evidence Code section 352.

Back before the jury, the prosecutor asked if Deshun had any safety concerns about testifying.  Deshun answered, "Always."  Something "possibly" could happen to Deshun, like "get caught up somewhere," or maybe the people still have a "beef" and would want to "finish the job of killing me too."  However, Deshun was not afraid to identify anyone.  When asked what could happen to snitches, Deshun answered there were "a lot of possibilities."

The prosecutor then went through Deshun's preliminary hearing testimony, and Deshun agreed with that prior testimony about having safety concerns, not wanting to be caught in crossfire, that it was bad to identify someone, that a snitch was someone who identified the perpetrator of a crime, and that someone might have to handle the "situation" by shooting or "kill[ing] us."

The prosecution filed a supplemental motion under Evidence Code section 402.  Citing Deshun's testimony, the prosecution asked to introduce evidence about "the concept of being a snitch within the gang culture."  The defense objected that the evidence was cumulative.  The trial court found, given

19

Deshun's "perplexing answers" and that he identified the group as Bounty Hunters rather than Denver Lane, that the evidence was relevant and not more prejudicial than probative. The trial court said the prosecutor could elicit testimony about how gangs view snitching but could not go into specific examples of witnesses who have been murdered.

The People's gang expert Sergeant Gonzalez then testified that "snitching" is breaking the code of silence that gang members and community members are expected to uphold, snitching can result in acts of violence, and it was possible for a witness to change his testimony to avoid being labeled a snitch.

B. *Expert testimony about snitching was admissible*

Knowles's argument on appeal appears to be that Sergeant Gonzalez's testimony about snitching in the gang context should have been excluded as cumulative of Deshun's testimony. As we now explain, we disagree.

Except "as otherwise provided by statute, only relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence is that having any tendency in reason to prove any disputed fact that is of consequence to the determination of the action. (Evid. Code, § 210; *People v. Tully* (2012) 54 Cal.4th 952, 1010.) A court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability its admission will necessitate undue consumption of time or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) Given the discretionary nature of this process, our review of a ruling under Evidence Code section 352 is "highly deferential." (*People v. Parker* (2022) 13 Cal.5th 1, 39.) We will not disturb a ruling under that section unless the trial court acted in an arbitrary, capricious, or

20

patently absurd manner that resulted in a clear miscarriage of justice.  (*Ibid.*)

Generally, gang evidence can be highly inflammatory. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.) Nonetheless, it may be admissible where it is relevant to the underlying charges.  (*Ibid.*; *People v. Chhoun* (2021) 11 Cal.5th 1, 31; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).)  Thus, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to the guilt of the charged crime."  (*Hernandez*, at p. 1049.)

The testimony of a gang expert may be admissible to establish gang culture.  (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1120; see generally Evid. Code, § 801 [expert may render opinion on subject "sufficiently beyond common experience" to assist trier of fact].)  For an "expert's opinion to be admissible, the subject matter need not be completely unfamiliar to the jury." (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 753.)  "Whether members of a street gang would intimidate persons who testify against a member of that or a rival gang is sufficiently beyond common experience that a court could reasonably believe expert opinion would assist the jury.  'It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes "respect." ' " (*People v. Gonzalez* (2006) 38 Cal.4th 932, 945.)  Thus, evidence explaining why a witness might be afraid to testify in a gang case is admissible in the trial court's discretion.  (*People v. Tran* (2022)

13 Cal.5th 1169, 1209 [trial court is entitled to admit evidence demonstrating fear of testifying]; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1035 [expert may testify "that witnesses to a gang-related crime are usually reluctant to testify because of fear of retaliation"]; see generally *People v. Flinner* (2020) 10 Cal.5th 686, 724.)

Sergeant Gonzalez's expert testimony about snitching was highly relevant. As the trial court said, Deshun's testimony about which gang the shooter and his companions were from was unclear. At trial, Deshun suggested that perpetrators were Denver Lane gang members, but they tried to "fake everyone out" by yelling a different gang's name, Bounty Hunters. It would not have been readily apparent to the trier of fact why Deshun might be so equivocal about identifying the gang. The expert clarified that a witness might feel pressure to misidentify a gang to avoid being labelled a snitch. This fear of retribution thus explained a reason for Deshun's testimony, which could be interpreted as a reluctance to clearly link the shooter with a specific gang.

Knowles, however, argues that Sergeant Gonzalez's expert testimony added "nothing to the jury's understanding of the factual matters before it, including Deshun's credibility," as Deshun had already acknowledged having concerns about retribution for testifying against gang members. To support this argument, Knowles attacks the trial court's justifications for exercising its discretion to admit the evidence.

He thus first asserts that the trial court erred in finding the evidence relevant to explain why Deshun said the group yelled "Bounty Hunters" rather than Denver Lane, which is the gang Knowles associated with. Rather, Knowles argues that Deshun expressly said the perpetrators were from the Denver

Lane gang. The record, however, is not as clear as Knowles makes it out to be. Deshun gave a statement to the police that the group was yelling about the Bloods and Denver Lane. Then, at the preliminary hearing, Deshun testified, "I heard a few people say some of them could have been from Denver Lane[ ], but I was only hearing Blood this and Blood that," and Deshun was "not sure" someone yelled, " 'Denver Lane[ ].' " At trial, Deshun testified to only hearing the group say, " 'Bounty' " and " 'Bloods.' " Although Deshun said that Denver Lane and Athens Park were the only Blood gangs in that area, Deshun did *not* hear them say " 'Denver Lane[ ].' " However, Deshun also said that the group might have been from Denver Lane trying to "fake people out," so "possibly" they were from Denver Lane.

Thus, as we have said, the expert's testimony was relevant to explain that Denver Lane might want to "fake people out" by yelling the name of another gang, Bounty Hunters, to gain easier entry into rival gang territory. Further, it explained why Deshun might be reluctant to clearly identify the perpetrators as Denver Lane gang members. This was not a tangential issue, as the identity of Edward's attackers and killer were main issues at trial, as was Deshun's credibility and the killer's intent.

Second, Knowles argues that Deshun did not accuse detectives of lying during the identification process, and therefore the trial court incorrectly relied on this to justify admitting the evidence. But this was not a basis for the trial court's ruling admitting gang evidence. It was merely an observation that Deshun's testimony was erratic. In any event, this was a fair characterization of what Deshun was suggesting. Deshun testified that Detective Lawler had Deshun focus on one photograph, and Deshun felt pressured to pick somebody, even if

nobody fit the shooter's description. When asked by the prosecutor on redirect examination if Deshun was saying that the detective suggested picking someone, Deshun said that was "how it sounded to me." The prosecutor then elicited that the detective admonished Deshun that the photographs may not contain the perpetrator, and there was no obligation to make an identification. In context, the trial court correctly found that Deshun intimated that the detective improperly pressured Deshun to identify Knowles. Deshun might not have technically said the detective lied, but Deshun nonetheless suggested that the detective behaved inappropriately and fraudulently. Therefore, the record supports the trial court's finding that Deshun's testimony about the circumstances surrounding the identification procedure supported admitting the evidence.

We therefore conclude that the evidence was relevant and admissible, and the trial court did not abuse its discretion by admitting it.

For the same reasons, admitting the gang evidence did not render Knowles's trial fundamentally unfair or otherwise violate his due process rights. Rather, the admission of evidence, even if erroneous under state law, results in a due process violation only if it renders the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Sergeant Gonzalez's testimony about snitching in the context of gang culture, was relevant, admissible, and relatively brief, comprising just over two pages of transcript. And it clarified and gave greater context to Deshun's own testimony about snitching.

III.  Admissibility of gang evidence

In addition to his contention that the trial court improperly admitted the expert's specific testimony about snitching, Knowles

24

contends that gang evidence generally was inadmissible. Again, we disagree.

### A.    *Additional background*

Before trial, the prosecution moved to admit gang evidence to establish motive, intent, and identification. The trial court found that photographs were admissible to establish the shooter's identity, that Detective Torres could testify he was familiar with Knowles and recognized him, and the prosecution could introduce evidence to explain why a group of people were crossing Vermont, yelling gang names, and asking the victim where he was from.

When the trial court asked defense counsel for a response, counsel did not address the ruling and instead asked the trial court to exclude any field identifications or stops involving Knowles, evidence about gang tattoos, past crimes committed by the Denver Lane gang, and "speculative or unparticularized general statements" about how gang activity negatively impacts community members. The trial court precluded the prosecution from raising these issues.

Later, during trial, the prosecution represented it could not establish Knowles's gang membership based on self-admissions to law enforcement but could do so through social media photographs and videos and his tattoos. Over defense counsel's objection, the trial court ruled that the evidence was admissible.

Then, in a supplemental motion under Evidence Code section 402, the prosecution sought to introduce a photograph taken at Gil's Liquor, which was just northeast of where Edward was killed. Also, the prosecution wanted to introduce evidence about Denver Lane's territory and Knowles's tattoos. Over defense counsel's objection, the trial court found the evidence relevant and more probative than prejudicial.

B.    *The gang evidence was admissible*

Knowles contends that gang evidence was inadmissible, focusing on evidence of his facial tattoo, photographs of him with other gang members at gang hangouts, and the gang hypothetical.  All of this evidence was highly relevant to motive, intent and identity, more probative than prejudicial, and, as such, admissible.

As we have said, the prosecution is "generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense."  (*People v. Chhoun*, *supra*, 11 Cal.5th at p. 31; *Hernandez, supra*, 33 Cal.4th at p. 1049.) "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego*, *supra*, 172 Cal.App.4th at p. 1167.) However, relevant evidence of a defendant's gang membership should be excluded if it creates a risk the jury will convict the defendant based on an improper inference the defendant has a criminal disposition.  (*People v. Melendez* (2016) 2 Cal.5th 1, 28–29.)

As we understand it, Knowles's first argument is that gang evidence was inadmissible because he was not part of the group that crossed Vermont shouting gang names, and there was no evidence he engaged in any gang conduct.  To the extent this is Knowles's argument, it is inaccurate.  As we have said, there was evidence Knowles was associated with the group, he had been with them at a known gang hangout just before the shooting, and he arrived at the strip mall a minute after the group.  By immediately approaching Edward when Knowles arrived at the strip mall, Knowles joined and supported the others.  Further, Keaton testified that Knowles issued a gang challenge to her,

asking where she was from. Therefore, the gang evidence was relevant to show Knowles was a gang member and had a gang-related motive for targeting Edward, who was in rival territory and was a Pimptown member. (See, e.g., *People v. Flores* (2020) 9 Cal.5th 371, 398 [expert testimony about gang-related motives for murder admissible]; *Hernandez, supra*, 33 Cal.4th at p. 1049 [evidence of gang affiliation and activity are relevant to motive or intent].)

Knowles also argues that the trial court improperly found that the prosecution had to prove he was a gang member as an element of murder. That is not correct. Rather, in the context of ruling on the admissibility of Knowles's tattoos and other gang evidence, the trial court said the prosecution had to prove Knowles was a member of Denver Lane insofar as his membership was relevant to prove identity, motive, and intent. The trial court never said that gang membership is an element of murder.

Second, Knowles argues that Sergeant Gonzalez's testimony that the "3k" in Knowles's "Denvaju3k" tattoo referred to "crip killer" was unduly prejudicial, cumulative, and of tangential relevance. But the shooter's identity was the main issue at trial. Knowles's tattoo tended to establish he was a Denver Lane gang member, while other evidence tended to establish that the group who attacked Edward were also members of that gang. Thus, the tattoo tended to establish he was at the strip mall that night. Knowles appears to argue that the tattoo was only tangentially relevant because other evidence showed that he was involved with "others claiming Bloods and Denver Lane[ ]." However, Knowles, both below and on appeal, attempted to distance himself from the "others," arguing that he

27

was not with them or part of that group. Accordingly, his tattoo was directly relevant to establish that he was a Denver Lane gang member, at the strip mall that night, and at the strip mall for a nefarious purpose and not by happenstance. Moreover, Knowles does not argue that the expert's explanation that the "Denva" portion of the tattoo referred to Denver Lane was inadmissible. Had the expert not then explained what the rest of the tattoo ("3k") might refer to, this omission could have stood out to the jurors and left them speculating what it might mean.

Third, Knowles argues that photographs of him with other individuals making gang signs with their hands at Denver Lane gang hangouts (Gil's Liquor and a motel) were unfairly prejudicial, cumulative, and of only tangential probative value. However, that Knowles hung out with Denver Lane gang members at known gang hangouts tended to show that he was a member of that gang and that he was a gang member who might commit violent acts to support the gang. Also, the photograph of Knowles with other individuals at Gil's Liquor, which was posted in an Instagram story on July 10, 2020, raised the inference that the photograph was taken just before the shooting, as Knowles and others in the photograph wore clothing matching the group that went to the Liquor Land strip mall that night. Moreover, Knowles wore clothing in the photograph matching the shooter's clothing. Similarly, in the photograph of Knowles at the other Denver Lane hangout, a motel, he wears clothes matching the shooter's clothes, and is with a man wearing a gray hooded sweatshirt, which is what the second man who was with the shooter wore. Thus, the photographs directly went to identity.

Lastly, Knowles asserts that the hypothetical posed to Sergeant Gonzalez was evidence of his bad character and

28

therefore inadmissible under Evidence Code sections 352 and 1101, subdivision (a), the latter of which prohibits evidence of a person's character to prove conduct on a specified occasion. However, hypotheticals rooted in the facts of the case are permissible.  (*People v. Flores*, *supra*, 9 Cal.5th at p. 398; *People v. Vang* (2011) 52 Cal.4th 1038, 1045.)  "While a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent."  (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.)  The hypothetical posed to Sergeant Gonzalez tracked the facts of this case.  Therefore, the evidence was admissible.

Because the gang evidence was relevant to motive, identity, and intent, we reject Knowles's final argument that its admission was fundamentally unfair.  (See generally *People v. Partida*, *supra*, 37 Cal.4th at p. 439.)  The trial court here meticulously considered the gang evidence, limited the prosecution's evidence, and granted a defense motion to exclude some gang evidence. Moreover, the trial court instructed the jury with CALCRIM No. 1403, which informed the jury it could consider the gang evidence for the limited purposes of whether Knowles had a motive for the charged crime, to evaluate the credibility of a witness, and when it considered "the facts and information relied on by an expert witness in reaching" an opinion.  The instruction further admonished the jury not "[to] consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."  (CALCRIM No. 1403.)  We

presume the jury followed that instruction. (*People v. Chhoun, supra*, 11 Cal.5th at p. 30.)

IV.     Mistrial motion

Knowles next contends that the trial court violated his due process rights by refusing to declare a mistrial after a law enforcement witness used a prohibited phrase suggesting that Knowles had a prior criminal background. The issue arose during the testimony of a criminalist, Luna, who explained how she created photographic six-packs. She testified that she created the photographic six-packs by finding people with similar characteristics to the suspect. She then identified one photograph of Knowles as a "booking photo." When asked where the other six-pack photographs came from, Luna said she found them by looking through "the Los Angeles County booking photos. So people that have previously been arrested." These references to booking photos and prior arrests, however, violated a trial court order excluding evidence of prior arrests or investigations involving Knowles and the court's instruction to the prosecutor to admonish his witnesses not to use words like bookings, arrests, and previous investigations and to instead use a neutral phrase like government or department resources.

The defense moved for a mistrial. The trial court found that Luna did not intentionally use the prohibited phrase and, having scrutinized jurors for any reaction to them and finding none, the trial court denied the motion.

" ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.

30

[Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 240.)

A witness's volunteered statement may be the basis for a mistrial motion. (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) In one case, for example, a witness blurted out that the defendant " 'got the word out,' " implying that the witness was beaten because the witness had testified against the defendant at the preliminary hearing. (*People v. Wharton* (1991) 53 Cal.3d 522, 565.) The trial court denied the defendant's mistrial motion. The appellate court affirmed, finding no incurable prejudice because the statement did not "directly implicate" the defendant, the trial court gave a curative admonishment, and other testimony dispelled any lingering doubt about the defendant's participation in the beating. (*Id.* at p. 566.)

In this case, Luna's inadvertent references to booking photos and prior arrests were much less inflammatory than the *Wharton* witness's statement implying that the defendant had committed violence against the witness for snitching. Luna's statements were brief, and, as the trial court carefully noted, had no visible impact on jurors who, the trial court said, looked bored and had no visible reaction. (See, e.g., *People v. Perez* (2018) 4 Cal.5th 421, 459–460 [brief statement about defendant's past criminality in recorded interview played for jury did not warrant mistrial where admonition given].)

The trial court did not give a curative admonition expressly directed at Luna's statements. However, CALCRIM No. 220 on reasonable doubt did instruct the jury not to be "biased against the defendant just because he has been arrested, charged with a

31

crime, or brought to trial." Although directed at Knowles's arrest for this crime, CALCRIM No. 220 is nonetheless not so limited. Given this instruction, the brevity of Luna's statements, the jury's lack of reaction to them, and that the statements did not clearly connect Knowles to a "history of criminality" as he asserts on appeal, we cannot find that the statements irreparably damaged Knowles's chance of receiving a fair trial. We therefore reject Knowles's argument that Luna's testimony, when coupled with other properly admitted evidence that he was a gang member with a Crip killer tattoo, was so prejudicial that a mistrial was warranted.

V.     Instructional error

Knowles contends that the trial court erred by refusing to instruct the jury on, first, voluntary manslaughter, heat of passion and imperfect self-defense and, second, on provocation that reduces a first degree murder to second degree murder.

A.     *Additional background*

The defense asked the trial court to instruct the jury on voluntary manslaughter, heat of passion and imperfect self-defense. Defense counsel argued that the victims provoked the confrontation, citing evidence that Deshun knocked down five or six people and that when Edward was asked where he was from, Edward responded, " 'Y'all know what it is, y'all know what I am.' " The prosecutor responded that there was no evidence Edward did anything to provoke either the group that crossed Vermont or the two people who came up from behind Edward. As to imperfect self-defense, there was no evidence about Knowles's state of mind.

After receiving further written briefing, the trial court disagreed that there was sufficient evidence Edward provoked the attack. Rather, Edward and Deshun were surrounded and outnumbered and there was "an absolute lack of evidence" that Knowles acted rashly or under the influence of intense emotion. The trial court therefore denied the request to instruct the jury on voluntary manslaughter, heat of passion.

Next, as to voluntary manslaughter, imperfect self-defense, the defense argued that Knowles, who was 20 years old during the events, had minimal life experience, so "it would be reasonable for him to feel in danger and in need to defend himself" and his friends. The trial court found that there was no evidence Knowles actually believed he needed to defend himself or others and denied the request to instruct on voluntary manslaughter, imperfect-self-defense.

B. *General principles*

A trial court must instruct on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses, even in the absence of a request. (*People v. Smith* (2013) 57 Cal.4th 232, 239.) Instruction on a lesser included offense is required when there is substantial evidence the defendant is guilty of the lesser, but not the greater, offense. (*People v. Landry* (2016) 2 Cal.5th 52, 98 (*Landry*).) This duty is not satisfied by instructing on only one theory if other theories are supported by the evidence. (*People v. Lee* (1999) 20 Cal.4th 47, 61.) Substantial evidence is that which a reasonable jury could find persuasive. (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) The existence of any evidence, no matter how weak, will not justify an instruction (*ibid.*), but the testimony of a single

witness, including the defendant, may suffice (*People v. Wyatt* (2012) 55 Cal.4th 694, 698).

We independently review whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) In making this determination, we do not evaluate the credibility of the witnesses. (*People v. Wyatt*, *supra*, 55 Cal.4th at p. 698.) We view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser included offense of murder. (§ 192, subd. (a); *People v. Nelson*, *supra*, 1 Cal.5th at p. 538; *People v. Moye* (2009) 47 Cal.4th 537, 549.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable but actual, good faith belief that deadly force is necessary in self-defense. (*Landry*, *supra*, 2 Cal.5th at p. 97; *Moye*, at p. 549.)

"The heat of passion sufficient to reduce murder to manslaughter 'exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition ... to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " ' " (*Landry*, *supra*, 2 Cal.5th at p. 97.) Thus, heat of passion manslaughter has objective and subjective components. (*People v. Moye*, *supra*, 47 Cal.4th at p. 549; *People v. Enraca* (2012) 53 Cal.4th 735, 759.) The "provocation which incites the defendant to homicidal conduct in the heat of passion

must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim" (*People v. Lee, supra*, 20 Cal.4th at p. 59), and must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, i.e., " 'from this passion rather than from judgment' " (*People v. Beltran* (2013) 56 Cal.4th 935, 939). To satisfy the subjective component, the defendant must have killed while under the actual influence of such a strong passion induced by legally adequate provocation. (*Moye*, at p. 550; *People v. Millbrook, supra*, 222 Cal.App.4th at p. 1139.) The passion aroused may be any violent, intense, high-wrought or enthusiastic emotion other than revenge. (*Millbrook*, at p. 1139.)

As to imperfect self-defense, the defendant must unreasonably but in good faith believe he was in imminent danger of death or great bodily injury. (*Landry, supra*, 2 Cal.5th at p. 97.) The doctrine is narrow and applies only where the defendant actually believes in the need for self defense and fears immediate harm that must be instantly dealt with. (*Ibid.*)

Failure to instruct on the lesser included offense of voluntary manslaughter amounts to constitutional error and is thus subject to review under *Chapman v. California* (1967) 386 U.S. 18, which asks whether the error was harmless beyond a reasonable doubt. (*People v. Schuller* (2023) 15 Cal.5th 237, 243.)

C. *Failure to instruct on voluntary manslaughter, heat of passion*

There was insufficient evidence to warrant instructing the jury on voluntary manslaughter under a heat of passion theory.

We first reject that these events resulted from a sudden quarrel started by Edward's conduct. Rather, the evidence is

that Knowles and his associates initiated the encounter, not Edward. (See, e.g., *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [*victim* must engage in provocative conduct].) The group that crossed Vermont were Denver Lane gang members and were already engaging in hostile, provocative behavior, yelling gang-related things like "Bloods" at passing cars. Then, at the strip mall, they deliberately approached Edward and his companions and asked where they were from. Although Knowles tries to distance himself from this behavior, Knowles was first seen not long after the Vermont group arrived, he too asked Keaton where she was from, he joined the others in surrounding Edward, and his companion in the gray sweatshirt threw the first punch. Therefore, while Knowles tries to paint a picture of a sudden, chaotic melee that he happened upon, that is not what the evidence shows.

Knowles also tries to paint Edward's statement that he was from Pimptown and that they knew who he was as sufficient to provoke an ordinary, reasonable person. However, Edward was *responding* to a gang challenge; Edward did not initiate the gang challenge. "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83.)

In any event, Edward's statements about being from Pimptown were legally insufficient to provoke an ordinary person of average disposition to shoot him. Gang-related challenges and

insults are legally insufficient to provoke an ordinary person. (*People v. Enraca, supra,* 53 Cal.4th at p. 759; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 [voluntary manslaughter instruction unwarranted where allegedly provocative act was just taunting words, a technical battery, or slight touching]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 (*Manriquez*) [victim calling defendant " 'mother fucker' " and repeated taunting of defendant insufficient to provoke reasonable person to bludgeon victim to death]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 739–740 [laughing, smirking, and name-calling insufficient to provoke reasonable person to shoot].) Reasonable people do not become homicidally enraged on hearing a gang reference or challenge. (*People v. Avila* (2009) 46 Cal.4th 680, 706.)

Otherwise, there was no evidence Edward engaged in provocative behavior. His companions testified that Edward was unarmed, no weapon was found at the crime scene, and when he was confronted, Edward put his palms up, inferentially to show that he was unarmed. Indeed, Garcia told Knowles that Edward was handicapped, but Knowles said he did not give "a fuck." This statement shows that Knowles knew Edward was not a threat.

As to the subjective component of voluntary manslaughter, there was no evidence Knowles was actually influenced by an intense emotion caused by any provocation rather than from judgment. (See, e.g., *Manriquez, supra,* 37 Cal.4th at p. 586.) Knowles did not testify at trial, and there was otherwise no evidence to show he exhibited anger, fury, or other intense emotion before shooting Edward. (Compare *id.* at p. 585 [no testimony victim's insults enraged defendant], with *People v. Dominguez* (2021) 66 Cal.App.5th 163, 180 [defendants' testimony they felt " 'super panicked' " and " 'super scared' " after

victim issued a gang challenge and lunged at them constituted sufficient evidence of subjective provocation].)

The evidence is to the contrary, that Knowles acted thoughtfully and deliberately and was not overcome by any sudden and intense emotion. Knowles and his companion, the man in the gray sweatshirt, approached Edward from behind while other Denver Lane gang members were already confronting Edward. Deshun saw Knowles begin to take out what looked like a gun and then put it back, showing Knowles was in full command of his actions. And Knowles ignored Garcia's plea not to shoot Edward, stating he did not give a "fuck."

We therefore conclude that there was insufficient evidence to support instructing the jury on voluntary manslaughter.

Having so concluded, we need not decide whether any error was harmless beyond a reasonable doubt. However, we note that error in failing to instruct on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to the defendant under other, properly given instructions. (*Manriquez*, *supra*, 37 Cal.4th at p. 582.) Knowles's jury found that the murder was premeditated, willful, and deliberate. "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*People v. Wharton*, *supra*, 53 Cal.3d at p. 572; accord, *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071–1072

38

[premeditation finding is "manifestly inconsistent" with acting under heat of passion]; *People v. Franklin* (2018) 21 Cal.App.5th 881, 894 ["jury's finding of premeditation and deliberation is 'manifestly inconsistent with having acted under the heat of passion' and nullifies any potential for prejudice"].)

Knowles, however, argues that we cannot rely on the premeditation finding to support a harmless error finding. He cites *People v. Berry* (1976) 18 Cal.3d 509. In that case, the Supreme Court found that the trial court erred by refusing to instruct on voluntary manslaughter based on sudden quarrel or heat of passion and reversed a first degree murder conviction. (*Id.* at p. 518.) In finding the error prejudicial, the court noted that the instructions made only casual and passing "reference to heat of passion and provocation for the purpose of distinguishing between murder of the first and second degrees." (*Ibid.*) There was no clear instruction to the jury to consider whether the victim's conduct provoked the defendant, as an ordinary person of average disposition, into committing the homicide under a heat of passion. (*Ibid.*) The court therefore concluded that the defendant's conviction of first degree murder under the instructions given did not establish that the factual question posed by the omitted instruction—that the defendant did not kill the victim under a heat of passion—was necessarily resolved adversely to the defendant under other, properly given instructions. (*Ibid.*)

*Berry* is distinguishable. The court there only considered "whether the error was harmless because the jury received some instruction on the concepts of heat of passion and provocation, not whether the error was harmless because the jury found the murder was willful, deliberate, and premeditated and such a

finding was inconsistent with a finding that the defendant acted in a heat of passion." (*People v. Peau* (2015) 236 Cal.App.4th 823, 831–832.) Stated otherwise, it is not clear that *Berry* considered the effect of a premeditation finding in its harmless error analysis. In contrast, Knowles's jury was instructed on premeditation with CALCRIM No. 521 and found true a premeditation allegation. Where, as here, a jury has expressly found that the murder was premeditated, willful, and deliberate, any error in failing to instruct on voluntary manslaughter is harmless. The jury necessarily found that Knowles did not kill Edward in the heat of passion.

Further, Knowles contends that the trial court's failure to instruct the jury on voluntary manslaughter, heat of passion violated his constitutional right to present a defense. (See generally *California v. Trombetta* (1984) 467 U.S. 479, 485 ["criminal defendants must be afforded meaningful opportunity to present a complete defense"]; *People v. Cash* (2002) 28 Cal.4th 703, 736 ["Defendants have a constitutional right to have the jury determine every material issue presented by the evidence, and a trial court's failure to instruct on lesser included offenses denies them that right."].) Given our conclusion that there was insufficient evidence to warrant giving the voluntary manslaughter, heat of passion instruction, this contention fails.

D.    *Failure to instruct on voluntary manslaughter, imperfect self-defense*

For the same reasons we have found that the trial court did not err by refusing to instruct the jury on voluntary manslaughter under a heat of passion theory, it did not err by refusing to instruct on voluntary manslaughter under an imperfect self-defense theory.  Rather, that theory also requires the defendant to have unreasonably but actually and in good faith believed he had to act in self-defense or defense of another. (*Landry, supra*, 2 Cal.5th at p. 97.)

There was insufficient evidence Knowles had any such belief.  As we have said, the evidence was that Knowles arrived with a man in a grey sweatshirt at the strip mall just after the main group arrived.  The main group had shouted gang names, they were Denver Lane gang members, Knowles was a Denver Lane gang member, and the main group and Knowles issued gang challenges to Edward and others.  As the gang expert testified, asking someone where they are from is a "violent" question.  Therefore, Knowles and his companions provoked and anticipated a physical confrontation.  That Knowles had a gun further buttressed the inference that he anticipated violence would occur.  A defendant cannot set up and provoke a violent confrontation and claim self-defense when the expected occurs.

Further, there is no evidence that Knowles actually believed he had to defend himself or others from Edward.  Rather, Knowles and his 10 or so companions outnumbered Edward and his friends.  When Garcia asked Knowles to leave the handicapped Edward alone, Knowles said he did not give a "fuck," which tends to show Knowles was not overcome by some intense fear or emotion.  (See, e.g., *People v. Oropeza, supra*, 151

41

Cal.App.4th at pp. 78–82 [only substantial evidence of defendant's state of mind came from testimony about his aggressive and provocative behavior].)  Edward was unarmed, put his palms up, and ran away.  Thus, Knowles had no reason to fear Edward.

E.  *Failure to instruct on provocation*

Knowles next contends the trial court erred in failing to instruct the jury on the provocation that reduces first degree murder to second degree murder, although he did not request that instruction, CALCRIM No. 522, at trial.  He thus asserts the trial court had a sua sponte duty to give the instruction, and further that his defense counsel was ineffective for failing to ask for it.  We disagree.

" 'First degree murder is an unlawful killing with malice aforethought, premeditation, and deliberation'; '[s]econd degree murder is an unlawful killing with malice, but without ... premeditation and deliberation.' " (*People v. Nunez* (2023) 97 Cal.App.5th 362, 368.)  "Provocation may preclude a defendant from subjectively premeditating and deliberating and, as a result, may reduce a murder from first degree to second degree." (*Ibid.*)  The test is a subjective one, asking whether the defendant acted because the defendant was provoked.

Provocation instructions are pinpoint instructions, and the trial court has no sua sponte duty to give the instruction absent a request. (*People v. Thomas* (2023) 14 Cal.5th 327, 384.)  Knowles did not request the instruction and has therefore forfeited the argument.

Nonetheless, because Knowles alternatively contends that his trial counsel provided ineffective assistance by failing to ask for the instruction, we address the issue on the merits.  A claim of

42

ineffective assistance of counsel requires a showing counsel's performance fell below an objective standard of reasonableness and prejudice from the error. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Ledesma* (2006) 39 Cal.4th 641, 745–746.)

For the same reasons the evidence was insufficient to support a voluntary manslaughter instruction, the evidence was also insufficient to warrant giving CALCRIM No. 522 on subjective provocation. There was no evidence Edward or any of his companions provoked Knowles, or that Knowles acted because he was provoked. Thus, Knowles's trial counsel did not engage in ineffective assistance by failing to ask the trial court to instruct on CALCRIM No. 522, and Knowles suffered no prejudice from its omission.

## VI.    Cumulative error

Knowles contends he is entitled to reversal because of cumulative error. "A series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) However, defendants are entitled to fair trials, not perfect ones. (*Ibid.*) Here, we have found no errors, harmless or otherwise. Therefore, there are no trial errors to cumulate.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

KLATCHKO, J.*

---

\*    Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.